NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-11688
SJC-11689


GREGORY DIATCHENKO & another[1] vs.  DISTRICT ATTORNEY FOR THE
SUFFOLK DISTRICT & others.[2]

COMMONWEALTH  vs.  JEFFREY S. ROBERIO.



Suffolk.     November 6, 2014. - March 23, 2015.

Present:  Gants, C.J., Spina, Cordy, Botsford, Duffly, Lenk, &
Hines, JJ.



Constitutional Law, Sentence, Parole, Assistance of counsel,
     Judicial review.  Due Process of Law, Sentence, Parole,
     Assistance of counsel.  Parole.  Practice, Criminal,
     Sentence, Parole, Assistance of counsel.  Witness, Expert.




     Civil action commenced in the Supreme Judicial Court for
the county of Suffolk on March 19, 2013.

     The case was reported by Botsford, J.

     Civil action commenced in the Supreme Judicial Court for
the county of Suffolk on March 10, 2014.

     The case was reported by Botsford, J.

_____

     [1] Jeffrey S. Roberio, intervener.

     [2] Chair of the Massachusetts Parole Board (board) and
Commissioner of Correction (commissioner).

Benjamin H. Keehn, Committee for Public Counsel Services, for Gregory Diatchenko & another.

Robert C. Thompson, Assistant District Attorney, for the Commonwealth.

Amy L. Karangekis, Assistant Attorney General, for Massachusetts Parole Board.

John P. Zanini, Assistant District Attorney, for District Attorney for the Suffolk District.

The following submitted briefs for amici curiae:

Kenneth J. Parsigian for Citizens for Juvenile Justice & others.

David J. Apfel, Kristen A. Kearney, Kunal Pasricha, & Katherine Connolly Sadeck for Campaign for the Fair Sentencing of Youth & others.

Afton M. Templin for Massachusetts Association of Criminal Defense Lawyers.

BOTSFORD, J.  In Diatchenko v. District Attorney for the Suffolk Dist., 466 Mass. 655 (2013) (Diatchenko I), this court considered the constitutionality of a life sentence without parole when applied to a juvenile homicide offender,[3] and, following Miller v. Alabama, 132 S. Ct. 2455 (2012), determined that the mandatory imposition of such a sentence violates the prohibition against cruel and unusual punishments in the Eighth Amendment to the United States Constitution as well as art. 26 of the Massachusetts Declaration of Rights.[4]  Diatchenko I, supra

---

[3] The term "juvenile homicide offender" refers in this opinion to a person who has been convicted of murder in the first degree and was under the age of eighteen at the time that he or she committed the murder.

[4] This court also concluded in Diatchenko v. District Attorney for the Suffolk Dist., 466 Mass. 655, 671 (2013) (Diatchenko I), that the discretionary imposition of a sentence

at 668.  The court held that a juvenile homicide offender who is convicted of murder in the first degree and receives a mandatory sentence of life in prison must be afforded a "meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation," and this opportunity must come through consideration for release on parole.  Id. at 674, quoting Graham v. Florida, 560 U.S. 48, 75 (2010).

The court's opinion in Diatchenko I has given rise to questions concerning how the opportunity for release on parole will be protected for juvenile homicide offenders. Specifically, Gregory Diatchenko and Jeffrey S. Roberio,[5] each of whom was convicted of murder in the first degree many years ago for a crime committed when he was seventeen years old,[6] argue that in order to ensure that their opportunity for release through parole is meaningful, they must have, in connection with a petition for release before the parole board (board), access to counsel, access to funds for counsel and for expert witnesses

of life in prison without parole violates art. 26 of the Massachusetts Declaration of Rights, which forbids the infliction of "cruel or unusual punishments."

[5] As discussed infra, in September of 2014, Roberio moved to intervene as a petitioner in Gregory Diatchenko's case, and the motion was allowed.

[6] For further discussion of the crimes for which Diatchenko and Roberio were convicted, see Commonwealth v. Diatchenko, 387 Mass. 718 (1982), and Commonwealth v. Roberio, 428 Mass. 278 (1998), S.C., 440 Mass. 245 (2003).

because they are indigent, and an opportunity for judicial review of the decision on their parole applications. For the reasons discussed below, we agree in substance with Diatchenko and Roberio.[7]

1. <u>Procedural history</u>. a. <u>Diatchenko</u>. In March of 2013, Diatchenko filed the present action in the county court, seeking a declaration that, because he was convicted of murder in the first degree and was seventeen at the time he committed the offense, his mandatory sentence of life without parole was unconstitutional following the United States Supreme Court's decision in <u>Miller</u>, 132 S. Ct. at 2469. The single justice reported the case to the full court.

The court issued its opinion in December, 2013. See <u>Diatchenko I</u>, 466 Mass. at 655. Having determined that juvenile homicide offenders could not validly be sentenced to life in prison without parole, the court turned to the task of finding an appropriate way to achieve a constitutionally permissible result, while still recognizing the Legislature's primary role

---

[7] We acknowledge the two amicus briefs submitted in support of Diatchenko and Roberio by Citizens for Juvenile Justice, the Children's League of Massachusetts, Prisoners' Legal Services of Massachusetts, the Campaign for the Fair Sentencing of Youth, the Justice Resource Institute, the Coalition for Effective Public Safety, the Lawyers' Committee for Civil Rights and Economic Justice, Professor Daniel Medwed, and the Hon. Gail Garinger (ret.); as well as the amicus brief submitted in support of Diatchenko by the Massachusetts Association of Criminal Defense Lawyers.

in establishing sentences for criminal offenses.  The approach we took was to declare invalid, as applied to juvenile homicide offenders, certain language in G. L. c. 265, § 2, creating an exception to parole eligibility for those convicted of murder in the first degree and leaving in full effect the remainder of the statute that imposed a mandatory sentence of life imprisonment.  See Diatchenko I, supra at 673.  The result was that any juvenile offender previously convicted of murder in the first degree, including Diatchenko, became eligible for parole after serving fifteen years of his or her sentence.  See id.  See also G. L. c. 265, § 2, as amended through St. 1982, c. 554, § 3; G. L. c. 127, § 133A, as amended through St. 1965, c. 766, § 1.  Because Diatchenko had already served approximately thirty-one years of his life sentence, he became eligible for parole immediately.  See Diatchenko I, supra.[8]

Pursuant to the opinion's rescript, the case was remanded to the single justice with the direction to enter a judgment

---

[8] In Commonwealth v. Brown, 466 Mass. 676 (2013), decided the same day as Diatchenko I, the remedy in Diatchenko I was extended to include juvenile offenders sentenced to life in prison for murder in the first degree going forward, such that they also are entitled to a parole hearing.  Brown, supra at 688.  The Legislature has since responded to these decisions by amending G. L. c. 265, § 2, and G. L. c. 127, § 133A, to incorporate into the statutes parole eligibility for juvenile offenders convicted of first-degree murder.  See G. L. c. 265, § 2, as amended through St. 2014, c. 189, § 5; G. L. c. 127, § 133A, as amended through St. 2014, c. 189, § 3.

consistent with the court's opinion in the case and to "take such further action as is necessary and appropriate." On February 27, 2014, Diatchenko filed a motion for entry of a judgment that would include a number of orders of specific relief, and also filed a motion for funds to retain an expert in connection with his hearing before the board. The district attorney for the Suffolk District (district attorney), the chair of the board, and the Commissioner of Correction (commissioner) filed oppositions. After a hearing, the single justice reserved and reported Diatchenko's case as well as Roberio's case, next discussed, to the full court.

In connection with the Diatchenko case, the single justice reported the following questions:

> "1. Whether, in order to ensure that the petitioner and other similarly situated juvenile homicide offenders receive the 'meaningful opportunity to obtain release' that is required by the court's opinion [in Diatchenko I], they must be afforded:
>
> "a. the right to assistance of counsel at their parole hearings, including the right to have counsel appointed if they are indigent; and
>
> "b. the right to public funds, if they are indigent, in order to secure reasonably necessary expert assistance at the hearings.
>
> "2. Whether, in order to ensure that the petitioner and other similarly situated juvenile homicide offenders receive the 'meaningful opportunity to obtain release' that is required by the court's opinion, there must be an opportunity for the petitioner or a similarly situated individual who is denied parole to obtain judicial review

of the parole board's decision, and if so, what form the judicial review will take."

b. <u>Roberio</u>. Following the Supreme Court's decision in <u>Miller</u>, in June, 2013, Roberio sought relief from his mandatory sentence of life without parole by moving in the Superior Court for resentencing under Mass. R. Crim. P. 30, as appearing in 435 Mass. 1501 (2001). He also filed a motion for funds pursuant to rule 30 (c) (5) to pay an expert neuropsychologist for assistance in connection with his motion for resentencing. The motion for funds was allowed, but Roberio's motion for resentencing was stayed pending the release of our decision in <u>Diatchenko I</u>, at which point he was resentenced to life with parole eligibility after fifteen years in prison. Because Roberio had been in prison for more than fifteen years, he was immediately eligible for parole.

On February 27, 2014, Roberio filed another motion for funds pursuant to rule 30 (c) (5) to retain the services of a second neuropsychologist because the previous neuropsychologist had died; Roberio sought to retain the expert in order to continue to seek to have his sentence reduced to a term of years or, alternatively, to assist him in connection with seeking parole. A second Superior Court judge allowed the motion after hearing, but stayed the order to permit the Commonwealth to seek relief from the single justice. On March 10, 2014, the

Commonwealth filed a petition for relief under G. L. c. 211, § 3, challenging the orders allowing Roberio's requests for funds to retain the experts. As indicated, on May 23, 2014, the single justice reserved and reported the Roberio case to the full court for decision, to be paired with the Diatchenko case. In September, 2014, Roberio filed a motion to intervene in the Diatchenko case. The single justice allowed the motion.

2. Suggestion of mootness. "Litigation ordinarily is considered moot when the party claiming to be aggrieved ceases to have a personal stake in its outcome." Acting Supt. of Bournewood Hosp. v. Baker, 431 Mass. 101, 103 (2000), quoting Attorney Gen. v. Commissioner of Ins., 403 Mass. 370, 380 (1988). The chair of the board, the commissioner, and the district attorney suggest that the case is moot with respect to Diatchenko because on October 31, 2014, the board approved his application for parole, and therefore, they contend, Diatchenko no longer has a personal stake in the resolution of the present case. See Massachusetts Parole Board, No. W38579, at 1 (Oct. 31, 2014). However, Diatchenko has not yet been released on parole; rather, the board required that Diatchenko first spend twelve months in a lower security prison before he may be released, so that he may "transition gradually to the community." Id. at 7. Since Diatchenko has not yet been released, he continues to have a personal stake in the outcome

of the case, and therefore his petition is not moot.  Moreover, Roberio has been permitted to intervene in the Diatchenko case, and he has not yet had a parole hearing.  Even if the case were moot as to Diatchenko, therefore, it is not moot with respect to Roberio.  We proceed to consider the reported questions and related claims raised on their merits.

3.  Discussion.  a.  Right to assistance of counsel.  The first reported question asks whether a juvenile homicide offender must be afforded the assistance of counsel in connection with his or her initial parole hearing.[9]  It is important to view the question in context.  The court's conclusion in Diatchenko I, that juvenile homicide offenders could not permissibly be subjected to life in prison without any opportunity for parole, flowed from the "fundamental '"precept of justice that punishment for crime should be graduated and proportioned" to both the offender and the offense,'" a central tenet of the Eighth Amendment and of art. 26.  Diatchenko I, 466 Mass. at 669, quoting Miller, 132 S. Ct. at 2463.  Drawing from the United States Supreme Court's recent decisions that focused on the requirement of proportional sentencing of youth, and in

---

[9] The reported questions do not specify the initial parole hearing, but we understand that to be the intended focus, and consider it as such.  We therefore do not consider here whether the procedural rights that we discuss in this opinion only apply with respect to a juvenile homicide offender's initial parole hearing.

particular the decisions in <u>Miller</u> and <u>Graham</u>,[10] <u>Diatchenko I</u> observed that "children are constitutionally different from adults for purposes of sentencing" and that the "distinctive attributes of juvenile offenders" render suspect the traditional justifications for imposing sentences of life without parole on these individuals. <u>Diatchenko I</u>, <u>supra</u> at 670-671, quoting <u>Miller</u>, <u>supra</u> at 2465. Therefore, in <u>Diatchenko I</u>, we held that Diatchenko and all juvenile homicide offenders serving mandatory life sentences deserve at least a "meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation," and that accordingly, at the appropriate time, they must be considered for parole suitability. <u>Diatchenko I</u>, <u>supra</u> at 671, 674, quoting <u>Graham</u>, 560 U.S. at 75. In other words, the conclusion we reached was that parole eligibility is an essential component of a constitutional sentence under art. 26 for a juvenile homicide offender subject to mandatory life in prison.[11]

---

[10] In <u>Miller</u> v. <u>Alabama</u>, 132 S. Ct. 2455, 2469 (2012), as noted previously, the United States Supreme Court held that the Eighth Amendment to the United States Constitution prohibits mandatory sentences of life without parole for those who were under the age of eighteen at the time they committed murder; in <u>Graham</u> v. <u>Florida</u>, 560 U.S. 48, 75 (2010), the Court held that those who committed a nonhomicide offense before the age of eighteen can never receive such sentences.

[11] Justice Spina's dissent argues that because <u>Miller</u> refers specifically to the requirement of proportionality in

In general, there is no constitutionally protected liberty interest in a grant of parole. See Greenholtz v. Inmates of the Neb. Penal & Correctional Complex, 442 U.S. 1, 7 (1979); Quegan v. Massachusetts Parole Bd., 423 Mass. 834, 836 (1996); Greenman v. Massachusetts Parole Bd., 405 Mass. 384, 388 n.3 (1989). However, the Supreme Court has acknowledged that in some cases, a liberty interest in parole requiring at least some minimal due process rights may derive from language in a State's parole statute that creates a "protectible expectation of parole." See Greenholtz, supra at 11-12 (statutory language and structure of Nebraska parole statute created expectancy of release constituting liberty interest entitled to protection of due process clause). See also Board of Pardons v. Allen, 482 U.S. 369, 371-372, 381 (1987).

Here, G. L. c. 127, § 130, does not create an expectation of release through parole, as Justice Spina's dissent points out. See post at    . Rather, what is at issue is art. 26's

"sentencing," unless a parole hearing is viewed as part of the sentencing process, there can be no constitutional basis for the procedural protections in parole hearings that the petitioners seek. See post at    . However, in concluding that all juvenile homicide offenders must have access to a "meaningful opportunity to obtain release," Diatchenko I identified under art. 26 a substantive requirement concerning the nature of the sentences that juvenile homicide offenders must receive. See Diatchenko I, 466 Mass. at 671, 674, quoting Graham, 560 U.S. at 75. This requirement goes beyond the procedural issue that Miller identified under the Eighth Amendment.

requirement that a juvenile homicide offender serving a
mandatory life sentence be provided a meaningful opportunity to
obtain release, so that his or her sentence is not effectively
one of straight life in prison -- an outcome that art. 26
prohibits.  In this context, where the meaningful opportunity
for release through parole is necessary in order to conform the
juvenile homicide offender's mandatory life sentence to the
requirements of art. 26, the parole process takes on a
constitutional dimension that does not exist for other offenders
whose sentences include parole eligibility.[12]

Thus, for example, in the case of an adult defendant
convicted of armed robbery and sentenced to a term of not less
than sixteen nor more than twenty years in prison, the defendant

---

[12] The fact that the opportunity for release through parole
is essential in order to guarantee the constitutionality of a
juvenile homicide offender's mandatory sentence of life in
prison does not "transform[] the conduct of the parole hearing
into part of the sentencing process" in this context, as Justice
Spina's dissent suggests.  See post at    .  Rather, for a
juvenile homicide offender -- as for virtually any offender
except an adult convicted of murder in the first degree -- the
offender's sentence is fixed at the time of sentencing, and the
opportunity to seek parole is merely a component of the sentence
that the offender receives from a judge.  See Commonwealth v.
Cole, 468 Mass. 294, 298-299, 302 (2014).  See also G. L.
c. 279, § 24.  Our decision today does not undermine this
relationship between sentencing and parole, but rather explores
further the purpose that parole eligibility serves in the
context of a juvenile homicide offender's mandatory life
sentence, and the additional protections that juvenile homicide
offenders require in order to ensure that that purpose is fully
achieved.

would be eligible for parole in sixteen years,[13] but if the defendant were denied a meaningful opportunity for release on parole, this would not render the sentence cruel or unusual and therefore unconstitutional under art. 26.  This is so because a State has no obligation to provide a parole system, see Greenholtz, 442 U.S. at 7-8, and if the defendant were to serve his or her entire sentence of twenty years with no opportunity at all for release on parole, that would have been a permissible sentence for the judge to have imposed at the outset.  The same is not true for juvenile homicide offenders; under G. L. c. 265, § 2, they must be sentenced to life in prison, but art. 26 does not allow either the Legislature or a judge to sentence such an offender to life in prison without the possibility of parole.[14]

---

[13] See G. L. c. 127, § 133; G. L. c. 279, § 24.

[14] Justice Spina's dissent emphasizes, post at    , that our decisions in Diatchenko I, Brown, Commonwealth v. Ray, 467 Mass. 115 (2014), and Commonwealth v. Keo, 467 Mass. 25 (2014), each applied the mandatory life sentence as specified in G. L. c. 265, § 2, for murder in the first degree to juvenile homicide offenders, albeit with the added instruction that these offenders must be eligible for parole in accordance with the parole statute.  See Ray, supra at 140; Keo, supra at 46-47. See also Diatchenko I, supra at 674 ("At the appropriate time, it is the purview of the . . . board to evaluate the circumstances surrounding the commission of the crime, including the age of the offender, together with all relevant information pertaining to the offender's character and actions during the intervening years since conviction.  By this process, a juvenile homicide offender will be afforded a meaningful opportunity to be considered for parole suitability").  From this, the dissent concludes that these decisions stand for the propositions that

We turn, then, to the question of what is procedurally required in order to protect a juvenile homicide offender's expectation of "a meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation." Graham, 560 U.S. at 75.[15]  "The extent of procedural due process which must be

_____

the existing parole procedures already afford a meaningful opportunity for release and that juvenile homicide offenders are "entitled only to the same parole hearing process as other inmates." See post at    .  The dissent then contends that today's decision improperly changes course and affords something more.  See post at    .  We disagree that we have changed course.  The cited decisions focused explicitly on the substantive punishment that the defendants in those cases must receive; in none of them did the court address any issue regarding the nature of the parole process for juvenile homicide offenders.  See Diatchenko I, supra at 674 n.18 ("The heart of this case is the constitutional validity of Diatchenko's sentence for murder in the first degree").  Moreover, as discussed infra, nothing in this opinion suggests that the procedures described in G. L. c. 127, § 133A, no longer apply to juvenile homicide offenders.  Rather, today's decision identifies additional procedural protections that must be afforded to these offenders within the context of the existing parole process, and an opportunity for a limited review of the board's decision.

Similarly, today's decision in no way conflicts with the Supreme Court's holdings in Miller and Graham.  Each of those cases addressed a specific context in which the Eighth Amendment prohibits the imposition of a sentence of life without parole on a juvenile offender.  See Miller, 132 S. Ct. at 2471; Graham, 560 U.S. at 75.  Parole was not the subject of Miller and Graham; life without parole was.  Those cases leave open the question of how to ensure that Miller's and Graham's requirement of a "meaningful opportunity to obtain release" for certain juvenile offenders is to be realized.  See Miller, supra at 2469; Graham, supra at 75.

[15] We emphasize that the offender does not have a protectable expectation that he or she necessarily will be

afforded in any situation varies with the nature of the private and governmental interests at stake . . . , but basic to due process is the right to be heard 'at a meaningful time and in a meaningful manner.'" Department of Pub. Welfare v. J.K.B., 379 Mass. 1, 3-4 (1979) (J.K.B.), quoting Armstrong v. Manzo, 380 U.S. 545, 552 (1965).  This court has concluded, for example, that an "indigent parent facing the possible loss of a child cannot be said to have a meaningful right to be heard in a contested proceeding without the assistance of counsel." J.K.B., supra at 4.  See Adoption of Meaghan, 461 Mass. 1006, 1007-1008 (2012) (where child's guardians filed petition for adoption that, if granted, would terminate parental rights, both nonconsenting indigent father and consenting child entitled to appointed counsel to provide meaningful opportunity to be heard).  See also Guardianship of V.V., 470 Mass. 590, 592-593 (2015).  For reasons we discuss next, the court's reasons for deeming appointment of counsel necessary in this context are instructive here:  "[t]he petition may well involve complex questions of fact and law, and require the marshalling and rebutting of sophisticated expert testimony"; and "[p]rovision

---

released at a particular time, or even at all.  See Diatchenko I, 466 Mass. at 674.  As discussed infra, the determination of whether a juvenile homicide offender merits parole requires consideration of many factors, which may or may not indicate that release is appropriate for any particular individual.

of appointed counsel not only safeguards the rights of the parents, but it assists the court in reaching its decision with the 'utmost care' and 'an extra measure of evidentiary protection,' required by law."  J.K.B., supra, quoting Custody of a Minor (No. 1), 377 Mass. 876, 877, 884 (1979).

By statute, the board is required to determine an individual's suitability for parole based on whether there is, in the opinion of the board, a "reasonable probability that, if [a] prisoner is released with appropriate conditions and community supervision, the prisoner will live and remain at liberty without violating the law and that release is not incompatible with the welfare of society."  G. L. c. 127, § 130. The decision is a discretionary one for the board "with which, if otherwise constitutionally exercised, the judiciary may not interfere."[16]  See Commonwealth v. Cole, 468 Mass. 294, 302 (2014).  In rendering a parole decision, the board is entitled to obtain significant amounts of information, including the following:  recommendations from parole staff; the inmate's prior criminal record; reports concerning the nature and circumstances of the offense, such as police reports, grand jury

---

[16] We return to this point infra.  Nothing in this opinion is intended to suggest that a judge or a court has the authority to decide whether a particular juvenile homicide offender is entitled to release on parole; judicial review is limited to the question whether the board has "constitutionally exercised" its discretion.  Cole, 468 Mass. at 302.

minutes, and trial transcripts; victim statements; information about the inmate's physical, medical, mental, and psychiatric status; disciplinary reports; classification reports; work evaluations; and records of educational achievements. See 120 Code Mass Regs. § 300.05 (1997). See also G. L. c. 127, § 135. The Department of Correction (department) maintains much of this information in a so-called "six-part folder" for the individual inmate that dates back to when the inmate was first detained in a Massachusetts correctional institution. See 103 Code Mass. Regs. §§ 155.07, 155.08 (2004). However, an inmate's access to certain evaluative information contained in this folder as well as other types of information available to the board may be restricted. See 103 Code Mass. Regs. §§ 155.10, 157.08 (2005); 120 Code Mass. Regs. §§ 301.04, 500.06 (2001).

The full board conducts initial parole hearings for individuals serving life sentences. 120 Code Mass. Regs. § 301.06(1) (2001). Notice of the hearing is provided to government officials, including the Attorney General, the office of the district attorney in whose district the inmate's sentence was imposed, the chief of police of the municipality where the crime was committed, and the Executive Office of Public Safety, as well as to the victim or the victim's immediate family members. See G. L. c. 127, § 133A; 120 Code Mass. Regs. § 301.06(3) (2001). During the parole hearing, the inmate or

his or her representative has an opportunity to make an opening statement, and then the inmate responds to questions from the board. 120 Code Mass. Regs. § 301.06(4) (2001). The board also may pose questions to any individual who appears in support of the inmate. Id. After the inmate has completed his or her presentation, the victim or victim's family has an opportunity to speak, as do public officials, and the board is tasked with eliciting "available evidence and testimony unfavorable to the inmate upon any relevant subject." Id. The board may permit the inmate to make a closing statement and may allow parties to submit memoranda or other documentation after the hearing. 120 Code Mass. Regs. §§ 301.06(4), (5) (2001). The board permits attorneys to represent inmates serving life sentences at their parole hearings, although currently there is no provision for providing counsel to those who are indigent.[17] 120 Code Mass. Regs. § 300.08 (1997).

The question the board must answer for each inmate seeking parole, namely, whether he or she is likely to reoffend, requires the board to weigh multiple factors and consider a wide

_____

[17] The board and the commissioner recognize in their brief that "certain benefits flow from access to counsel and experts," and therefore have taken no position on the first two questions reported by the single justice in the Diatchenko case. The district attorney for the Suffolk District, however, argues that Diatchenko and Roberio are not entitled to counsel, funds to retain counsel, or funds to retain experts.

variety of evidence. In the case of a juvenile homicide offender -- at least at the initial parole hearing -- the task is probably far more complex than in the case of an adult offender because of "the unique characteristics" of juvenile offenders. Diatchenko I, 466 Mass. at 674. See Miller, 132 S. Ct. at 2464. A potentially massive amount of information bears on these issues, including legal, medical, disciplinary, educational, and work-related evidence. In addition, although a parole hearing is unlike a traditional trial in that it does not involve direct and cross-examination of witnesses by attorneys, because the inmate's parole application may well be opposed by both the victim's family and public officials, it would be difficult to characterize this as an uncontested proceeding.

Thus, like a proceeding to terminate parental rights, a parole hearing for a juvenile homicide offender serving a mandatory life sentence involves complex and multifaceted issues that require the potential marshalling, presentation, and rebuttal of information derived from many sources. See J.K.B., 379 Mass. at 4. An unrepresented, indigent juvenile homicide offender will likely lack the skills and resources to gather, analyze, and present this evidence adequately.[18] Furthermore,

---

[18] A juvenile homicide offender -- who will have spent his or her entire adult life and presumably some of his or her teenage years in prison -- also will likely need to overcome a

although parole hearings are not contested in the strictest sense, the juvenile homicide offender seeking parole is likely to be required to overcome arguments by both victims' family members and government officials opposed to the offender's release; the former of these parties may present as particularly sympathetic, while the latter will likely have greater advocacy skills than the offender seeking parole.[19]

In sum, given the challenges involved for a juvenile homicide offender serving a mandatory life sentence to advocate effectively for parole release on his or her own, and in light of the fact that the offender's opportunity for release is critical to the constitutionality of the sentence, we conclude

---

host of personal challenges in order to be able to present a persuasive case for parole on his or her own. The challenges could include a lack of formal education, as well as undeveloped critical thinking and organizational skills; a history of trauma, drug use, or mental illness; a limited ability to access his or her own psychiatric or other record information regarding the impact or context of this history; and balancing the need to take responsibility and express remorse for the crime, while at the same time pointing out all the factors that may have made him or her, as a juvenile, less morally culpable. See Russell, Review for Release: Juvenile Offenders, State Parole Practices, and the Eighth Amendment, 89 Ind. L.J. 373, 419-421 (2014). An especially significant challenge is likely to be the juvenile offender's isolation from the outside community, making it difficult to present a solid release plan. See id. at 421.

[19] Additionally, as noted in the context of parental rights termination cases, the availability of counsel in a case may help to clarify for the decision maker some of the more complicated issues involved. See Department of Pub. Welfare v. J.K.B., 379 Mass. 1, 4 (1979).

that this opportunity is not likely to be "meaningful" as required by art. 26 without access to counsel.

Turning to the question of appointment of counsel for indigent juvenile homicide offenders like Diatchenko and Roberio, G. L. c. 211D, § 5, authorizes the Committee for Public Counsel Services (committee) to maintain a system for appointment of counsel at any stage of a criminal or noncriminal proceeding in which "the laws of the commonwealth or the rules of the supreme judicial court require that a person in such proceeding be represented by counsel . . . provided . . . that such person is unable to obtain counsel by reason of his indigency." In light of our conclusion here that a juvenile homicide offender serving a mandatory life sentence must have access to counsel in connection with an initial application for parole, § 5D offers legislative authorization and an appropriate mechanism, through the work of the committee, for the appointment of counsel for indigent juvenile homicide offenders.[20]

---

[20] We acknowledge that Quegan v. Massachusetts Parole Bd., 423 Mass. 834 (1996), appears to contradict this conclusion. See id. at 840 ("[The Committee for Public Counsel Services (CPCS)] has no right, however, to represent an indigent prisoner before the parole board unless there is a criminal proceeding pending in which CPCS represents the prisoner and representation of the prisoner-defendant before the parole board is appropriate in order to protect the defendant's interests in the pending criminal matter"). However, Quegan was decided in the context

b.  Access to funds for expert witnesses.  The second
reported question concerns access to expert witnesses.[21]
Diatchenko and Roberio contend that, like access to counsel, it
is necessary, in order to secure a meaningful opportunity for
release, to have access to the assistance of expert witnesses.
Specifically, they argue that, as juvenile offenders convicted
of murder, they need experts to be able to explain and offer
opinions on issues concerning the relationship between
neurobiological immaturity and culpability in general as well as
factors relating to each of their individual and family
circumstances that may help both to explain past conduct and
assess future risk of reoffending.  As this court acknowledged
in Diatchenko I, scientific research on adolescent brain
development has revealed "myriad significant ways that this
development impacts a juvenile's personality and behavior," some
of which suggest decreased moral culpability for certain

_____

of a prisoner seeking parole who had no constitutionally
protected interest that entitled him to any due process
protections.  See id. at 836, 839.  Here, we have concluded that
a juvenile homicide offender is entitled to representation by
counsel in connection with the initial parole hearing.  Legal
representation of an indigent juvenile homicide offender is thus
required by law.  See id. at 839. In addition, the court in
Quegan was interpreting a section of G. L. c. 211D that has
since been repealed by the Legislature.  See id.; G. L. c. 211D,
§ 14, repealed by St. 2011, c. 68, § 117.

   [21] The second reported question, in substance, raises many
if not all of the issues of concern to the Commonwealth in its
G. L. c. 211, § 3, petition in the Roberio case.

juvenile homicide offenders or indicate a greater potential for them to mature to a point where they no longer engage in the behaviors that led to their crimes.  See Diatchenko I, 466 Mass. at 669-670.[22]  While the assistance of a psychologist or other expert witness may not be necessary for every juvenile homicide offender serving a life sentence who seeks parole, in some cases such assistance may be crucial to the juvenile's ability to obtain a meaningful chance of release.[23]

---

[22] See also Miller, 132 S. Ct. at 2464-2465 (research on adolescents showing "transient rashness, proclivity for risk, and inability to assess consequences . . . both lessened a child's 'moral culpability' and enhanced the prospect that, as the years go by and neurological development occurs, his 'deficiencies will be reformed'" [citation omitted]); Graham, 560 U.S. at 68 ("[D]evelopments in psychology and brain science continue to show fundamental differences between juvenile and adult minds.  For example, parts of the brain involved in behavior control continue to mature through late adolescence").

[23] Roberio's case offers a good example of how a juvenile homicide offender's mental health and cognitive development history could become a central issue in a parole hearing.  At Roberio's second murder trial, he presented a defense that, at the time of his crime, he lacked the substantial capacity to conform his conduct to the requirements of the law due to an attention deficit hyperactivity disorder, an oppositional defiant disorder, and a learning disability, all of which were exacerbated by alcohol use.  See Commonwealth v. Roberio, 440 Mass. 245, 247 (2003).  A psychological reevaluation of Roberio in 2013, when he was forty-four years old, suggested to the neuropsychologist performing the evaluation that many of the neurological and behavioral challenges Roberio experienced in his teenage years had resolved.  In these circumstances, it may be essential that Roberio be in a position to present the board with an expert opinion explaining the path of his apparent growth in cognitive and emotional maturity and its relationship to the question of whether he would be likely to reoffend if

Neither G. L. c. 211D, § 5, nor any other statute expressly authorizes the expenditure of funds for expert witnesses to assist such a juvenile in the context of a parole hearing. Roberio argues that the allowance of the fee request is authorized under Mass. R. Crim. P. 30 (c) (5), which in relevant part provides: "The court, after notice to the Commonwealth and an opportunity to be heard, may also exercise discretion to allow the defendant costs associated with the preparation and presentation of a motion under this rule." However, we agree with the Commonwealth that in its current form, rule 30 (c) (5) does not authorize the allowance of funds to a defendant to retain an expert witness in connection with a parole hearing, because a parole hearing is not a "motion under this rule [i.e., rule 30]."[24]

It is also the case that G. L. c. 261, §§ 27A-27G, the statutory provisions generally authorizing the payment of public funds to cover costs and fees of indigent litigants, apply most directly to costs and fees relating to court proceedings, not proceedings before administrative or executive agencies like the

released on parole. As previously indicated, the board acknowledges that the availability of expert witnesses may be beneficial in the parole hearing context.

[24] The motions specifically described in Mass. R. Crim. P. 30, as appearing in 435 Mass. 1501 (2001), are a motion under rule 30 (a) for immediate release or to correct sentence and a motion for a new trial under rule 30 (b).

board.  See, e.g., <u>Doe, Sex Offender Registry Bd. No. 89230</u> v. <u>Sex Offender Registry Bd</u>., 452 Mass. 764, 778-780 (2008).  In addition, this court has held that G. L. c. 261, § 27C (4), provides "extra fees and costs," including funds for expert witnesses,[25] only in the context of a "prosecution, defense or appeal."  See, e.g., <u>Commonwealth</u> v. <u>Davis</u>, 410 Mass. 680, 684 (1991).  See also <u>Commonwealth</u> v. <u>Arriaga</u>, 438 Mass. 556, 569 (2003).  However, these cases have generally addressed the availability of costs for indigent defendants pursuing nonconstitutionally mandated procedures.[26]  Moreover, even where a defendant's right to a particular postconviction procedure is not constitutionally guaranteed, as is the case, for example, with motions for a new trial, this court has still required that indigent defendants nevertheless have meaningful access to whatever postconviction proceedings the State makes available. See <u>Commonwealth</u> v. <u>Conceicao</u>, 388 Mass. 255, 261-262 (1983).[27]

---

[25] General Laws c. 267, § 27A, defines "extra fees and costs" as including fees for expert assistance.

[26] See <u>Commonwealth</u> v. <u>Davis</u>, 410 Mass. 680, 684 & n.7 (1991) (posttrial motion at issue was not "constitutionally mandated," and therefore indigent defendant had "no constitutional right to State funding to support investigations in anticipation of such a motion").

[27] Justice Spina's dissent notes that the result in <u>Commonwealth</u> v. <u>Conceicao</u>, 388 Mass. 255, 261 (1983), was that counsel was not guaranteed for every defendant seeking to file a motion for a new trial, but that provision of counsel to

See also Reporter's Notes to Rule 30 (c) (5), Mass. Rules of Court, Rules of Criminal Procedure, at 223 (Thomson Reuters 2014) (discussing 2001 amendments to rule 30 allowing judges discretion to authorize costs for indigent defendants pursuing postconviction procedures).

Because the postconviction proceeding at issue here, a parole hearing for a juvenile homicide offender, is required in order to ensure that an offender's life sentence conforms to the proportionality requirements of art. 26, the proceeding is not available solely at the discretion of the State. Rather, it is constitutionally mandated, and as such, it requires certain protections not guaranteed in all postconviction procedures. It is appropriate, therefore, to construe G. L. c. 261, §§ 27A-27G, to authorize a Superior Court judge, upon motion of a parole-eligible, indigent juvenile homicide offender, to allow for the

---

indigent defendants was within the discretion of the motion judge. See post at    . While that is true, Conceicao emphasized that because "a State has no obligation to provide a procedure enabling defendants to make motions for a new trial, it need not place poor and wealthy defendants on an absolutely equal level in terms of the services available to them in pursuing a motion for a new trial." Conceicao, supra. Since art. 26 requires that juvenile homicide offenders have a meaningful opportunity for release through parole, that reasoning does not apply here. Rather, we cite Conceicao and Reporter's Notes to Rule 30 (c) (5), Mass. Rules of Court, Rules of Criminal Procedure, at 223 (Thomson Reuters 2014), for the premise that judges have discretion to authorize costs to defendants when necessary to guarantee meaningful access to postconviction procedures.

payment of fees to an expert witness to assist the offender in connection with his or her initial parole proceeding in certain limited contexts -- specifically, where it is shown that the juvenile offender requires an expert's assistance in order effectively to explain the effects of the individual's neurobiological immaturity and other personal circumstances at the time of the crime, and how this information relates to the individual's present capacity and future risk of reoffending. The judge may exercise discretion to do so when the judge concludes that the assistance of the expert is reasonably necessary to protect the juvenile homicide offender's meaningful opportunity for release.[28]

c. Availability of judicial review. The third reported question asks whether there must be an opportunity for judicial review of a decision denying parole to a juvenile homicide offender and, if so, what form judicial review will take. The board, the commissioner, and the district attorney argue that art. 30 of the Massachusetts Declaration of Rights prohibits judicial review in this context. Article 30 requires strict separation of judicial and executive powers, and the power to

---

[28] We request this court's standing advisory committee on the rules of criminal procedure to propose a procedure that will permit an indigent juvenile homicide offender to seek funds for an expert witness or witnesses to support the offender's requests for parole, consistent with this opinion.

grant parole, being fundamentally related to the execution of a prisoner's sentence, lies exclusively within the province of the executive branch. See Cole, 468 Mass. at 302-303; Commonwealth v. Amirault, 415 Mass. 112, 116-117 (1993). However, as we have noted, the right of the executive branch to exercise this power without intervention from the judiciary is subject to the provision that the power must be "constitutionally exercised." See Cole, supra at 302. This is not to suggest that the board is unconstitutionally exercising this power currently,[29] or is likely to do so in the future, but only that this court retains the responsibility with respect to parole hearings to ensure that any constitutional requirements are met. Thus, this court has never held that art. 30 precludes any type of judicial review of parole board decisions. In fact, Massachusetts courts have engaged in limited review of parole proceedings, consistently if not frequently. See, e.g., Quegan, 423 Mass. at 835 (prisoner sought declaration that board may not consider refusal to admit guilt in parole determination); Greenman, 405 Mass. at 386 (prisoner challenged basis of parole denial as beyond board's statutory authority); Blake v. Massachusetts Parole Bd., 369 Mass. 701, 702 (1976) (prisoner sought

---

[29] We agree with Justice Cordy's dissent that there is no "hint" in this record that the board is exercising its authority in an unconstitutional manner. See post at    .

declaration of right to appear personally before board in order to argue for early parole eligibility); Doucette v. Massachusetts Parole Bd., 86 Mass. App. Ct. 531, 532 (2014) (prisoner pursued civil rights claim alleging violation of due process in parole revocation proceeding as well as certiorari action challenging merits of board's decision to revoke parole).[30],[31]

As previously stated, the parole hearing acquires a constitutional dimension for a juvenile homicide offender because the availability of a meaningful opportunity for release on parole is what makes the juvenile's mandatory life sentence constitutionally proportionate. In this particular context, judicial review of a parole decision is available solely to

---

[30] It bears noting that courts frequently rule on certiorari petitions by prisoners claiming that the Department of Correction (department) has violated their constitutional rights. See, e.g., Ciampi v. Commissioner of Correction, 452 Mass. 162, 163 (2008); Puleio v. Commissioner of Correction, 52 Mass. App. Ct. 302, 305-306 (2001); Drayton v. Commissioner of Correction, 52 Mass. App. Ct. 135, 135-137 (2001). The board is located within the department (although not subject to its jurisdiction). See G. L. c. 27, § 4. Given this, it is difficult to accept the proposition that actions of the department are subject to judicial review to assure compliance with the Federal and State Constitutions, but that art. 30 prohibits any form of judicial review of decisions of the board.

[31] The chair of the board and the commissioner point out that a judge may not "revise or revoke sentences when the parole board does not act in accordance with a judge's expectations." See Commonwealth v. Amirault, 415 Mass. 112, 116 (1993). We agree, and we do not suggest anything to the contrary in this case.

ensure that the board exercises its discretionary authority to make a parole decision for a juvenile homicide offender in a constitutional manner, meaning that the art. 26 right of a juvenile homicide offender to a constitutionally proportionate sentence is not violated.[32]

That being said, the art. 26 right of a juvenile homicide offender in relation to parole is limited. To repeat: it is not a guarantee of eventual release, but an entitlement to a meaningful opportunity for such release based on demonstrated maturity and rehabilitation. See Diatchenko I, 466 Mass. at 674. That entitlement arises directly from the recognition that

---

[32] In light of Diatchenko I, the board has adopted guidelines for parole determinations for juvenile homicide offenders serving life sentences, and these guidelines take into account the unique characteristics of youth. See Massachusetts Parole Board, Guidelines for Life Sentence Decisions (updated Mar. 3, 2014), available at http://www.mass.gov/eopss/agencies/parole-board/guidelines-for-life-sentence-decisions.html [http://perma.cc/K33Z-YSEA]. The board is to be commended for doing so, but its adoption of guidelines does not preclude or render unnecessary the need for judicial review. The guidelines are not binding and are subject to change. More importantly, the board is not in a position to make a determination that the art. 26 right of a juvenile homicide offender to a proportionate sentence has been protected.

Nor does the existence of appeal procedures before the board adequately protect this right. The board's regulations permit inmates denied parole to request an appeal before the same hearing panel that rendered the initial denial, or to request reconsideration by a staff member of the board. See 120 Code Mass. Regs. §§ 100.00, 304.1 (2001). Neither of these processes provides the same opportunity for review by a neutral decision maker that judicial review affords.

children are constitutionally different from adults, with "diminished culpability and greater prospects for reform," Miller, 132 S. Ct. at 2464, based on their "distinctive attributes" of youth. See Diatchenko I, supra at 660, 671. These include children's "lack of maturity and an underdeveloped sense of responsibility, leading to recklessness, impulsivity, and heedless risk-taking"; vulnerability "to negative influences and outside pressures, including from their family and peers; . . . limited contro[l] over their own environment[;] . . . [lack of] the ability to extricate themselves from horrific, crime-producing settings"; and unique capacity to change as they grow older (citations and quotations omitted). Id. at 660. Absent consideration of these attributes, a juvenile homicide offender may not be permitted a real chance to demonstrate maturity and rehabilitation. See id. at 675 (Lenk, J., concurring), citing Miller, 132 S. Ct. at 2468. The purpose of judicial review here is not to substitute a judge's or an appellate court's opinion for the board's judgment on whether a particular juvenile homicide offender merits parole, because this would usurp impermissibly the role of the board. Rather, judicial review is limited to the question whether the board has carried out its responsibility to take into account the attributes or factors just described in making its decision.

With this in mind, we consider the form of judicial review of a board decision denying initial parole to a juvenile homicide offender. Diatchenko and Roberio suggest that judicial review in this context should be in the nature of certiorari, as described in G. L. c. 249, § 4, rather than through an action for declaratory relief under G. L. c. 231A. We agree that certiorari is appropriate here, although we do not agree with their view of the scope or standard of that review.

"[A] complaint for declaratory relief is an appropriate way of testing the validity of regulations or the propriety of practices involving violations of rights, which are consistent and repeated in nature. . . . It is not, however, an appropriate remedy where the validity of an adjudication . . . in an individual case is being challenged. There relief in the nature of certiorari is to be sought." (Citation omitted.) Averett v. Commissioner of Correction, 25 Mass. App. Ct. 280, 287 (1988), S.C., Averett, petitioner, 404 Mass. 28 (1989). See Grady v. Commissioner of Correction, 83 Mass. App. Ct. 126, 135-136 (2013). As discussed, the type of limited judicial review contemplated would focus on the parole determinations relating to a particular juvenile homicide offender. It thus falls into the category of cases appropriate for certiorari review.

The standard of review to be applied is a separate question, because the "standard of review for an action in the

nature of certiorari depends on 'the nature of the action sought to be reviewed.'" Rivas v. Chelsea Hous. Auth., 464 Mass. 329, 334 (2013), quoting Black Rose, Inc. v. Boston, 433 Mass. 501, 503 (2001). See G. L. c. 249, § 4. Because the decision whether to grant parole to a particular juvenile homicide offender is a discretionary determination by the board, see Cole, 468 Mass. at 302; G. L. c. 127, § 130, an abuse of discretion standard is appropriate. See Forsyth Sch. for Dental Hygienists v. Board of Registration in Dentistry, 404 Mass. 211, 217 (1989) (review of discretionary administration or decision in certiorari action limited to whether act or decision was "arbitrary and capricious"); Doucette, 86 Mass. App. Ct. at 541. See generally L.L. v. Commonwealth, 470 Mass. 169, 185 n.27 (2014). The question for the reviewing judge will be whether the board abused its discretion in the manner in which it considered and dealt with "the distinctive attributes of youth [that] diminish the penological justifications for imposing the harshest sentences on juvenile offenders," as they relate to the particular circumstances of the juvenile homicide offender seeking parole. Miller, 132 S. Ct. at 2465. Accord Diatchenko I, 466 Mass. at 671. In this context, a denial of a parole application by the board will constitute an abuse of discretion only if the board essentially failed to take these factors into account, or did so in a cursory way. A judge may not reverse a

decision by the board denying a juvenile homicide offender parole and require that parole be granted. Rather, if the judge concludes that the board's consideration of the juvenile offender's status as a juvenile and the distinctive attributes of his or her youth did constitute an abuse of discretion -- was arbitrary and capricious -- a remand to the board for rehearing would be appropriate.[33]

It remains for us to address Diatchenko's argument that juvenile homicide offenders seeking review of a parole denial should be able to bring an action for certiorari to a single justice of this court as a matter of course. Although this court and the Superior Court have concurrent jurisdiction to entertain actions in the nature of certiorari under G. L. c. 249, § 4, as with most original actions for certiorari, these actions are most appropriately brought in the Superior Court.

Finally, we summarize the scope of our opinion in this case, and clarify what the opinion does not say. First, we

---

[33] Justice Spina, in his dissent, expresses concern that without the affirmative power to grant parole after a denial by the board, this limited form of judicial review has the potential to result in an endless cycle of board hearings and actions for certiorari, until the board ultimately grants parole. See post at    . This outcome is unlikely. Given the limited scope of judicial review in this context, and the deference that must be afforded to the board, we think decisions to vacate a parole denial will be rare; moreover, should that occur, we assume that at a new hearing, the board will remedy the error or errors that caused the matter to be remanded.

consider here only the initial parole hearing available to juvenile homicide offenders.  For the reasons discussed supra, the procedural protections of representation by counsel and the opportunity to obtain expert assistance in connection with that initial parole hearing are necessary for such offenders in light of their mandatory life sentences and the constitutional requirement of proportionality in sentencing.  See Diatchenko I, 466 Mass. at 669-671; id. at 675 (Lenk, J., concurring).  In Commonwealth v. Okoro, post    ,    (2015), also decided today, and for the same reasons, we afford the same procedural protections to juvenile offenders convicted of murder in the second degree, who also are subject to mandatory life sentences with eligibility for parole.  Nothing in this opinion, however, is intended to suggest that any other class of offenders is also entitled to these protections in connection with the parole hearing process.

Second, in affording juvenile homicide offenders the procedural protections at issue here, we emphasize that the determination whether to grant a parole application of an individual juvenile homicide offender is, and remains, a discretionary decision for the board to make.  As previously noted, that standard is governed by G. L. c. 127, § 130, which prohibits a prisoner from receiving parole unless the board concludes that if the prisoner is released, "the prisoner will

live and remain at liberty without violating the law and that release is not incompatible with the welfare of society."

Third, and relatedly, the board remains fully authorized to determine, consistent with legislative mandates,[34] the rules and procedures it deems appropriate for the conduct of its parole hearings, and free to reach whatever decision in each case it deems appropriate. The dissents suggest that in establishing minimal requirements of due process for juvenile homicide offenders in their parole hearings, the court interferes unnecessarily and improperly with the operations of the parole board, an executive agency, trenching on principles of separation of powers. Post at , . Our decision does not commit this offense. Insofar as we conclude that the provision of counsel and of funds for expert witnesses is required for juvenile homicide offenders, these are procedures whose sole purpose is to protect the constitutional entitlement that these juvenile offenders have to a meaningful opportunity for parole release.[35] Finally, the limited judicial review provided here does not authorize judges to substitute their judgment with respect to the parole release decision for the board's. As

---

[34] See, e.g., G. L. c. 127, §§ 130, 133A.

[35] As we have noted, see note 17, supra, the chair of the board and the commissioner recognize "certain benefits flow[ing]" from these procedures, and do not view them as interfering with the board's authority.

discussed, the judiciary's only role in these cases will be to ensure that the board's determination whether to grant or deny parole to a juvenile homicide offender is "constitutionally exercised," Cole, 468 Mass. at 302, in the sense that the board properly has taken into account the offender's status as a child when the crime was committed.

4. Applicability of this decision. Diatchenko and Roberio appear to confine their requests to the limited group of individuals who were convicted of murder in the first degree and sentenced to mandatory life without parole prior to the Supreme Court's decision in Miller, and who became eligible for parole pursuant to this court's decision in Diatchenko I. We do not share the view that the decision in this case applies only to that limited group. Rather, it applies more generally to all juvenile offenders convicted of murder.

5. Conclusion. The matter is remanded to the county court, where the single justice will enter a judgment consistent with this opinion.

So ordered.

SPINA, J. (dissenting, with whom Cordy, J., joins).  I respectfully dissent from the decision of the court today.  The court has misconstrued Diatchenko v. District Attorney for the Suffolk Dist., 466 Mass. 655, 674 (2013) (Diatchenko I), which required only a "meaningful opportunity to obtain release" in the form of a parole hearing for juveniles convicted of murder in the first degree.  The court instead has created a path by which such an offender may obtain, as of right, access to counsel, funds for expert witnesses, and, if denied parole, judicial review of the decision of the parole board (board).  The solution at which the court arrives today ignores previous statements of the law on this matter.  Our decision in Diatchenko I did not create a significant liberty interest in the outcome of the parole hearing.  Diatchenko I stood solely for the proposition that the exception to parole eligibility in G. L. c. 127, § 133A, no longer applies to Gregory Diatchenko and Jeffrey S. Roberio and left the remainder of the statutory scheme unchanged.  That statutory scheme continues to apply unaltered to them and similarly situated inmates.

1.  Meaningful opportunity.  In Diatchenko I, we addressed the United States Supreme Court's holding in Miller v. Alabama, 132 S. Ct. 2455 (2012), that juveniles convicted of murder in the first degree could no longer receive life sentences without

the possibility of parole unless a court determined they were incorrigible.  We adopted the language in Miller, first expressed in Graham v. Florida, 560 U.S. 48, 75 (2010), that a juvenile offender receiving a life sentence must receive "some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation."  Inherent in this line of cases is the judicial recognition that "children are constitutionally different from adults for purposes of sentencing." Diatchenko I, 466 Mass. at 670, quoting Miller, supra at 2464.  The Supreme Court reasoned that a sentence of life in prison without the possibility of parole removes any penological justification for the sentence because it "forswears altogether the rehabilitative ideal."  Graham, supra at 74.

The court says "the meaningful opportunity for release through parole is necessary in order to conform the juvenile homicide offender's mandatory life sentence to the requirements of art. 26 [of the Massachusetts Declaration of Rights]."  Ante at    .  I agree.  After Diatchenko I, a juvenile convicted of murder in the first degree, like every juvenile who is sentenced to incarceration, is eligible for parole, whereas before such a juvenile was not.  The thrust of Diatchenko I was an expectation of parole eligibility, and no more.

The court improperly synthesizes two premises to arrive at a more significant but now constitutionally untenable

conclusion.  The court correctly recognizes that (1) children are "constitutionally different from adults for purposes of sentencing" and (2) that a life sentence for a juvenile convicted of murder in the first degree is cruel and unusual under art. 26 without a meaningful opportunity for release through a demonstration of rehabilitation.  Fusing these propositions together, the court concludes that the "meaningful opportunity" for release for juveniles convicted of murder in the first degree has a "constitutional dimension" that exists for no others and requires "additional procedural protections." Ante at    & n.14.  This conclusion is erroneous because the court applies the first premise to the second when, in fact, the second premise flows from the first.

The court states that other sentences, except life sentences for juveniles convicted of murder in the first degree, "include parole eligibility."  Ante at    .  The opposite is true.  Parole is an executive action separate and distinct from a judicial sentence.  See Commonwealth v. Cole, 468 Mass. 294, 302 (2014) ("[The granting of parole] is a function of the executive branch of government with which, if otherwise constitutionally exercised, the judiciary may not interfere"). Cf. Simms v. State, 65 Md. App. 685, 689 (1986) ("A parole is an act of executive clemency.  It does not involve the sentencing function or any other judicial function").  Cf. also Knight v.

United States, 73 F.3d 117, 119 (7th Cir. 1995), cert. denied, 519 U.S. 827 (1996) ("Parole is an extension of the [c]onstitutional grant of clemency power given to the President"); State v. Hewett, 270 N.C. 348, 352 (1967) ("Probation relates to judicial action taken before the prison door is closed, whereas parole relates to executive action taken after the door has closed on a convict").  Were Massachusetts to abandon its system of parole, art. 26 would only require that juveniles convicted of murder in the first degree -- and thus sentenced to life -- be afforded some opportunity for release from imprisonment through a demonstration of rehabilitation, the only constitutionally available penological justification for the State's harshest penalty.  Miller, 132 S. Ct. at 2468 ("this mandatory punishment [of life without parole] disregards the possibility of rehabilitation even when the circumstances most suggest it").  In such a hypothetical scenario, art. 26 would not require parole for any juvenile sentenced to a term of years because that sentence -- or any other lesser sentence -- has a penological justification other than rehabilitation.  See id. at 2465-2466 (outlining penological justifications of sentences as applied to juveniles).

In constitutionally guaranteeing that juveniles convicted of murder in the first degree are eligible for parole, we have already previously respected juveniles' constitutional

distinctiveness from adults convicted of murder in the first degree by the imposition of a sentence that is not cruel and unusual. By imposing today these additional procedural protections, the court reaches beyond the judicial function of sentencing to regulate the conduct of the initial parole hearing itself, the manifestation of the executive prerogative to execute the sentence. In so doing, the court transforms the conduct of the parole hearing into part of the sentencing process, at least for juveniles convicted of murder in the first degree, and implicates the action of the board in the sentence itself.

The Legislature never intended such a relationship between sentence and parole. Moreover, it is something that we expressly said in Cole, 468 Mass. at 302, is forbidden, because sentencing is "a quintessential judicial power." Id., quoting Commonwealth v. Rodriguez, 461 Mass. 256, 264 (2012). In Cole, we held that the executive branch's imposition of punishments under G. L. c. 127, § 133D (c), against those who violated community parole supervision for life improperly interfered with the judicial power to impose a sentence. Cole, supra. Today we are dealing with the opposite scenario, in which the court subsumes the executive power to regulate the conduct of a parole hearing into part of the sentencing process.

If the court's decision should be considered not to have rendered the conduct of the initial parole hearing of a juvenile convicted of murder in the first degree part of the sentencing process, then the court's justification for "additional procedural protections" in such a hearing fails because "children are constitutionally different from adults for purposes of sentencing" (emphasis added). Diatchenko I, 466 Mass. at 670, quoting Miller, 132 S. Ct. at 2465. Parole is not part of the sentencing process and thus the parole hearing need not recognize the difference between children and adults for purposes of art. 26.

The Supreme Court specifically identified traditional parole hearings as capable of providing that "meaningful opportunity to obtain release." Graham, 560 U.S. at 75. In both Graham and Miller, the Court even went so far as to explicitly state that "a State is not required to guarantee eventual freedom." Miller 132 S. Ct. at 2469; Graham, supra. The term "meaningful opportunity" was a warning that the Eighth Amendment to the United States Constitution "forbid[s] States from making the judgment at the outset that those offenders never will be fit to reenter society" (emphasis added). Graham, supra. "The Eighth Amendment does not foreclose the possibility that [a juvenile convicted of murder in the first degree] will remain behind bars for life." Id. Read together these cases

stand for the proposition that Diatchenko and Roberio, and similarly situated inmates, must be afforded a standard parole hearing, and by implication, this hearing will provide these individuals with the "meaningful opportunity" of release.

This warning is in congruence with the Court's previous statements that "no constitutional or inherent right of a convicted person to be conditionally released before the expiration of a valid sentence" exists. Greenholtz v. Inmates of the Neb. Penal & Correctional Complex, 442 U.S. 1, 7 (1979). Accord Quegan v. Massachusetts Parole Bd., 423 Mass. 834, 836 (1996). Indeed, in Diatchenko I we recognized that "[o]ur decision should not be construed to suggest that individuals who are under the age of eighteen when they commit murder in the first degree necessarily should be paroled once they have served a statutorily designated portion of their sentences." Diatchenko I, 466 Mass. at 674. These statements cannot be reconciled with the court's reasoning today that the "process" of the initial parole hearing of a juvenile convicted of murder in the first degree "takes on a different constitutional dimension that does not exist for other offenders whose sentences include parole eligibility." Ante at    .

Absent the recognition of a new liberty interest in the outcome of parole, the court does not explain the constitutional necessity of these additional protections but simply inserts a

new "constitutional dimension."  This "constitutional dimension" identified by the court is the foundation for the new constitutional rule that juveniles convicted of murder in the first degree require different procedural protections from those given to other offenders.  The court provides juveniles under a mandatory life sentences with enhanced procedures that no others receive, yet there has been no suggestion that the parole hearing others receive falls short of a meaningful opportunity. We have never previously stated or hinted at such a difference in procedural safeguards.  In Diatchenko I, we determined that the appropriate remedy to the defendant's challenge under Miller was to leave intact as much of the statutory scheme designed by the Legislature as possible, so far as it remained constitutional.  Diatchenko I, 466 Mass. at 673.  Accordingly, we struck down only the provision making juveniles ineligible for parole and let the remaining provisions of the statute stand.  Id.  In Commonwealth v. Brown, 466 Mass. 676 (2013), and Commonwealth v. Ray, 467 Mass. 115 (2014), we affirmed our intent to interfere with the enacted legislation as little as possible and do nothing more than invalidate the exception for parole eligibility.

In Brown, this court held that the rules of severability require trial judges to apply the parole statute as written with the exclusion of the one unconstitutional provision.  Brown, 466

Mass. at 680. In so doing, this court upheld the trial judge's decision to impose "as much of the sentencing scheme set forth in [the statute] as would be permissible in light of Miller's prohibition against mandatory sentences of life without parole for juveniles." Id. We would not have instructed trial judges to apply the statute in a manner that preserved as much of the expressed intent of the Legislature as possible if we intended to create a process different from that provided for in the then-existing statutory scheme.

More recently, in Ray, we expressed a view that the normal procedures governing consideration of parole release would apply to juveniles convicted of murder in the first degree. Ray, 467 Mass. at 139-140. "Pursuant to our holding in Diatchenko, . . . the defendant's life sentence remains in force, but the exception in G. L. c. 265, § 2, rendering him ineligible for parole, no longer applies. The defendant is eligible for parole in accordance with the terms of G. L. c. 127, § 133A." Id. See Commonwealth v. Keo, 467 Mass. 25, 47 (2014) ("the lesser punishment under G. L. c. 265, § 2, of mandatory life in prison with the possibility of parole, set pursuant to the parole eligibility statute in effect at the time of the juvenile offender's crime, would apply"). This language strongly suggests that the court intended for the remainder of the statutory scheme to apply to Diatchenko and Roberio and that

they are entitled only to the same parole hearing process as other inmates.

Undoubtedly, Diatchenko and Roberio have a right to a "hearing that shall afford [them] a meaningful opportunity to obtain release," Diatchenko I, 466 Mass. at 674, but only via the same processes and established procedures that all other inmates serving life sentences have, and not through a new liberty interest in parole with accompanying greater constitutional protections.  The court today seemingly "ignores the distinction, adopted by the Supreme Court, between [potentially] being deprived of a liberty that one already has and being denied a conditional liberty that one desires." Greenman v. Massachusetts Parole Bd., 405 Mass. 384, 388 n.3 (1989).

Moreover, in Diatchenko I, we outlined the process necessary to afford a juvenile convicted of murder in the first degree such a "meaningful opportunity," saying only that

> "it is the purview of the Massachusetts parole board to evaluate the circumstances surrounding the commission of the crime, including the age of the offender, together with all relevant information pertaining to the offender's character and actions during the intervening years since conviction.  By this process, a juvenile homicide offender will be afforded a meaningful opportunity to be considered for parole suitability."

466 Mass. at 674.[1]  We did not hold that the Massachusetts Constitution requires a new kind of parole hearing; and we said nothing about changing the standard process in any respect (much less requiring appointed counsel or granting funds for expert testimony) in order for the juvenile offender to obtain his "meaningful opportunity."  Instead, we said that a process that considers the above mentioned factors provides juvenile offenders with a "meaningful opportunity to obtain release."

This understanding is in line with decisions of Massachusetts and Federal courts that have long held that the possible release arising under the parole statute does not create a liberty interest in parole.  See Greenman, 405 Mass. at 388 n.3 ("The individual characteristics of the Massachusetts statutory parole scheme do not give rise to a liberty interest under Federal law").  See also Doe v. Massachusetts Parole Bd., 82 Mass. App. Ct. 851, 858 (2012) ("A prisoner in the Commonwealth does not have a liberty interest in the future

---

[1] The parole board (board) updated its "Guidelines for Life Sentence Decisions," available at http://www.mass.gov/eopss/ agencies/parole-board/guidelines-for-life-sentence-decisions.html [http://perma.cc/K33ZYSEA], most recently on March 3, 2014.  These guidelines reflect the mandates of our decision in Diatchenko v. District Attorney for the Suffolk Dist., 466 Mass. 655 (2013) (Diatchenko I), specifically providing that "an inmate who committed the offense as a juvenile will be evaluated with recognition of the distinctive attributes of youth, including immaturity, impetuosity, and a failure to appreciate risks and consequences."

grant of parole"); <u>Lynch</u> v. <u>Hubbard</u>, 47 F. Supp. 2d 125, 127-128 (D. Mass. 1999) (Massachusetts parole statute's negative phrasing prevents an expectation or presumption of release). Essentially, under G. L. c. 127, § 133A, Diatchenko and Roberio do not have an expectation or presumption of release and <u>Diatchenko I</u> did nothing to overtly change the statutory scheme. If we had intended to create an entirely new liberty interest in parole where there had been none previously, we would have explicitly said so. We did not, and <u>Diatchenko I</u> did not create a liberty interest in parole for juveniles convicted of murder in the first degree.

2. <u>Right to counsel</u>. The court concludes that juveniles convicted of murder in the first degree who seek parole constitutionally are entitled to representation by counsel because a parole hearing is a contested, complex proceeding similar to that involving the termination of parental rights. Therefore, because juveniles convicted of murder in the first degree -- imprisoned at a young age -- are unlikely to advocate as fully as possible for themselves and a parole hearing is similar to a proceeding terminating parental rights, the court concludes that constitutionally guaranteed access to counsel best ensures that the parole hearing is a "meaningful opportunity." I disagree.

The court's analogy between parental right termination proceedings and parole hearings does not withstand closer scrutiny. The proceedings we examined in Department of Pub. Welfare v. J.K.B., 379 Mass. 1 (1979), can result in the loss of rights to conceive and raise one's children -- rights that are "essential . . . basic civil rights of man . . . far more precious . . . than property rights." Id. at 3, quoting Stanley v. Illinois, 405 U.S. 645, 651 (1972). In J.K.B., supra at 4, we affirmed that one cannot lose a right without due process, and we ensured that due process be observed by access to counsel for indigent parents. Parole hearings, however, do not result in the loss of any rights. As explained above, an expectation of parole simply does not exist in these proceedings and our decision in Diatchenko I has not changed that fact.[2] Without an

_____

[2] The court's acknowledgment that Quegan v. Massachusetts Parole Bd., 423 Mass. 834, 840 (1996), contradicts its proposed funding mechanism and its rationalization that a juvenile convicted of murder in the first degree is entitled to representation "thus required by law" stems from characterizing the plaintiff in Quegan as "a prisoner seeking parole who had no constitutionally protected interest that entitled him to any due process protections." Ante at n.20. The only reason Quegan contradicts the court's conclusion that G. L. c. 211D, § 5, is the appropriate authorization mechanism is because the court baldly asserts that the class of inmates at issue requires a different sort of parole hearing with additional procedural protections from a hearing available to any other class applying for parole. Juveniles convicted of murder in the first degree do not merit anything more than a chance to appear before the board in the same manner as other inmates do. To grant them greater protection creates a perverse incentive.

expectation of parole, a juvenile convicted of murder in the first degree has no protected liberty interest, or right, to lose.[3]

Our decision in Diatchenko I did not suggest that the current parole process did not adequately provide a "meaningful opportunity to obtain release." We most certainly did not suggest that publicly funded counsel is necessary to protect one's interest in a fair hearing. The right to counsel based in the Sixth Amendment to the United States Constitution and art. 12 of the Massachusetts Declaration of Rights does not traditionally have an application to parole hearings. The United States Supreme Court explicitly noted that the right to counsel does not extend to postconviction collateral proceedings, see Douglas v. California, 372 U.S. 353, 356 (1963), and that "[i]n the context of parole . . . the procedures required are minimal." Swarthout v. Cooke, 131 S. Ct. 859, 862 (2011).

---

[3] We also consistently have held in our cases dealing with postconviction rights in other contexts that a defendant is not entitled to a full array of due process. See Commonwealth v. Arriaga, 438 Mass. 556, 569 (2003) (no right to public funds to obtain postconviction relief); Jackson v. Commonwealth, 430 Mass. 260, 264 (1999), cert. denied, 528 U.S. 1194 (2000) (no absolute right to counsel in moving for new trial); Commonwealth v. Conceicao, 388 Mass. 255, 263-264 (1983) (no absolute right to appointed counsel in obtaining postconviction relief under Mass. R. Crim. P. 30, as appearing in 435 Mass. 1501 [2001]).

We consistently have rejected claims that an inmate is entitled to counsel at parole hearings. See Cole, 468 Mass. at 306; Quegan v. Massachusetts Parole Bd., 423 Mass. 834, 840 (1996) (no right to representation before board unless there is independent and pending criminal proceeding that could be affected by parole proceedings).[4] Parole is not a part of the criminal prosecution or the adversarial process, but rather arises subsequently and is supervised by an executive administrative agency rather than the court. Because parole is separate and apart from criminal proceedings for those convicted of murder in the first degree as juveniles, the full breadth of due process rights, including the right to counsel, does not apply during such hearings.

Further, at this juncture, Diatchenko and Roberio have not made a sufficient showing that the parole hearing process available to them is inadequate or that the unique skills of a lawyer are necessary in order to have a "meaningful opportunity to obtain release." This is particularly so given that the

---

[4] Courts in other jurisdictions similarly have rejected claims that an inmate is entitled to counsel at parole release hearings. See Warren v. United States Parole Comm'n, 659 F.2d 183, 195 (D.C. Cir. 1981); Holup v. Gates, 544 F.2d 82, 85 (2d Cir. 1976); Bearden v. South Carolina, 443 F.2d 1090, 1095 (4th Cir. 1971). Hawaii is the only State to grant a right to counsel at parole release and review hearings by statute. Haw. Rev. Stat. § 706-670(3)(b), (c). Should the Massachusetts Legislature take similar action, the debate here would be moot.

current parole process requires the board to consider the circumstances of the crime, including whether Diatchenko and Roberio were juveniles at its commission, and whether they have been rehabilitated. Additionally, numerous inmates convicted of murder in the second degree as juveniles have been paroled after release hearings conducted without the aid of appointed counsel. While "lifer hearings" certainly require considerable preparation, the board is not called upon to resolve disputed issues of fact, strict rules of evidence do not apply, and witnesses need not be subjected to cross-examination.

The court maintains that an attorney is needed to collect materials pertaining to a juvenile homicide offender's criminal history and personal development after conviction. However, at the time of a parole hearing, the factual record in these cases already has been well established either in a trial transcript or in a decision of this court. Additionally, the Department of Correction (department) keeps a historical record containing detailed medical, psychiatric, and disciplinary records in each inmate's six-part folder. 103 Code Mass. Regs. § 155.07 (2014). These records are available to Diatchenko and Roberio before their hearings and to the board for review.[5] See G. L. c. 127,

---

[5] The court highlights that an inmate's access to this information may be restricted. Ante at . The issue of what may or may not be restricted in these circumstances is best left

§ 135; 103 Code Mass. Regs. § 157.08 (2005); 120 Code Mass. Regs. § 300.05(1)(i) (1997).  Finally, and notably, the court does not suggest that the statutory standard for granting parole or the requirements for membership to the board are unconstitutional.

3.  Expert witness funds.  The court also concludes that a parole-eligible juvenile convicted of murder in the first degree may petition a Superior Court judge to authorize the payment of fees to retain an expert witness to explain effectively "the effects of the individual's neurobiological immaturity and other personal circumstances at the time of the crime, and how this information relates to the individual's present capacity and future risk of reoffending."  Ante at   .  The majority derives this right from the same mistaken interpretation that a "meaningful opportunity" of parole grants juveniles convicted of murder in the first degree more rights in a parole hearing than any other class of inmate.  For substantially the same reasons that a juvenile convicted of murder in the first degree is not guaranteed access to counsel, neither is he or she guaranteed access to funds for expert witness testimony.

---

to another day, but I note that the Department of Correction must "make every effort to disclose all evaluative information which is reasonably segregable from" certain enumerated categories to an inmate.  103 Code Mass. Regs. § 157.08(4) (2005).

The power to allocate and direct public funding among competing public purposes is traditionally within the purview of the Legislature. See Opinion of the Justices, 430 Mass. 1201, 1202 (1999); County of Barnstable v. Commonwealth, 422 Mass. 33, 45 (1996). The court construes G. L. c. 261, §§ 27A-27G, as authorizing the expenditure of public funds because the parole hearing at issue is constitutionally mandated. Ante at    . For support, the court cites our cases that guaranteed "meaningful access to whatever postconviction proceedings the State makes available" for indigent defendants who sought postconviction relief. Ante at    , citing Commonwealth v. Conceicao, 388 Mass. 255, 261-262 (1983). At issue in Conceicao was the question whether "meaningful access" included access to counsel as of right. Id. at 258. We concluded that the decision to grant access to counsel for the preparation of a motion for a new trial was within the discretion of the motion judge. Id. at 262. We recommended counsel only in the event the defendant demonstrated a colorable or meritorious issue. Id. Importantly, we recognized that not every inmate need be placed on exactly the same footing as any other by providing counsel in order to guarantee meaningful access. Id. at 261.

General Laws c. 261, § 27C (4), echoes the legislative acknowledgment that "meaningful access" does not necessarily require the blanket authorization of public funds in support of

a defendant's efforts following his direct appeal.  This section authorizes provision of public funds needed by an indigent applicant for an "effective . . . prosecution, defense or appeal."  Yet funds under the statute are generally not available to support a defendant's effort to obtain postconviction relief, because those proceedings are not a part of the prosecution, defense, or appeal.  See Commonwealth v. Arriaga, 438 Mass. 556, 569 (2003).

Finally, according to its enabling statute, members of the board must come from a diverse background, including the fields of psychology or psychiatry.  G. L. c. 27, § 4.  Additionally, at least one member of the board must now have experience in forensic psychology, St. 2014, c. 189 (1), and the board must consider scientific and technical factors at its hearings.  The board now is obligated to consider youth-related factors in order to fulfil the mandates of both Miller and Diatchenko.[6] These requirements assist in ensuring that Diatchenko's and Roberio's hearings provide a truly "meaningful opportunity" for release, without a need for their own experts.

4.  Certiorari.  The court today establishes judicial review of the denial of parole to a juvenile convicted of murder in the first degree through an action for certiorari.

---

[6] As noted previously, the board has updated its guidelines to reflect our decision in Diatchenko I.  See note 1, supra.

Certiorari is available when there is "(1) a judicial or quasi-judicial proceeding, (2) from which there is no other reasonably adequate remedy, and (3) a substantial injury or injustice arising from the proceeding under review." Indeck v. Clients' Sec. Bd., 450 Mass. 379, 385 (2008). Such review conflicts with our previous understanding of the separation of powers enshrined in art. 30 of the Massachusetts Declaration of Rights. "The granting of parole, or conditional release from confinement, is a discretionary act of the parole board" and "is a function of the executive branch of government with which, if otherwise constitutionally exercised, the judiciary may not interfere." Cole, 468 Mass. at 302. See Stewart v. Commonwealth, 413 Mass. 664, 669 (1992). We previously have stated that a statute that "impermissibly allocates a power held by only one branch to another" violates art. 30. Cole, supra. Today's holding violates art. 30 because it permits a judge to "nullify the discretionary actions of the parole board." Commonwealth v. Amirault, 415 Mass. 112, 116-117 (1993). Accord Woods v. State Bd. of Parole, 351 Mass. 556, 559 (1967) ("Even by a writ of mandamus, the board may be required merely to consider a prisoner's petition for parole. The board may not be required to exercise any discretion for the benefit of a prisoner").

As detailed above, Diatchenko I did not create any additional rights for a juvenile convicted of murder in the

first degree more expansive than those possessed by any other class of inmate. The use of certiorari to ensure that a parole hearing provides a "meaningful opportunity" for release ignores the existence of a "reasonably adequate remedy." Indeck, 450 Mass. at 385. An inmate may seek relief from decisions of the board by means of an action for declaratory relief under G. L. c. 231A. See Gangi v. Massachusetts Parole Bd., 468 Mass. 323, 324 (2014); Massachusetts Parole Bd. v. Brusgulis, 403 Mass. 1010, 1011 (1989). Chapter 231A provides inmates with the opportunity to challenge the "practices or procedures [of the board] . . . alleged to be in violation of the Constitution of the United States or of the constitution or laws of the commonwealth." G. L. c. 231A, § 2. Accordingly, Diatchenko, Roberio, and similarly situated inmates may contest the board's practices that fail to consider the unique characteristics of juvenile offenders as well as displayed growth and change from adolescence, as required by Diatchenko I.

Certiorari is limited to correcting substantial errors of law that affect material rights and are apparent on the record. Gloucester v. Civil Serv. Comm'n, 408 Mass. 292, 297 (1990). The only material right at stake to juveniles convicted of murder in the first degree is the expectation of parole eligibility, not the substance of the board's decision. Moreover, the use of certiorari permits the reviewing court only

to affirm or set aside a decision of the tribunal whose actions are under review. Commonwealth v. Ellis, 11 Mass. 462, 466 (1814) ("this Court . . . can only affirm the proceedings . . . or quash them"); Commonwealth v. Blue-Hill Turnpike Corp., 5 Mass. 420, 423 (1809) ("on certiorari we can enter no new judgment"); Melvin v. Bridge, 3 Mass. 305, 306 (1807) ("If the Court were to consider these proceedings as certified on a certiorari, the plaintiff in error could not be relieved, as a judgment for costs could not be rendered, but only the proceedings affirmed or quashed"). Consequently, lacking any affirmative power, a court could only set aside a decision of the board and then remand the matter to the board, a process that could be repeated ad infinitum until the board grants parole. See Woods, 351 Mass. at 559. Not only are courts ill-equipped to decide whether parole should be granted, but such a decision -- both historically and legally -- has been reserved for the executive branch.

The court notes that judicial review by an action for certiorari would not encompass whether a particular juvenile convicted of murder in the first degree is entitled to release on parole but rather would be limited to the question whether the board has "constitutionally exercised" its discretion. Ante at   n.16, citing Cole, 468 Mass. at 302. If the reviewing judge is not concerned with the individual outcome of the matter

before him or her, then the judge is by default only reviewing the procedure of that matter. "[A] complaint for declaratory relief is an appropriate way of testing the validity of regulations or the propriety of practices involving violations of rights, which are consistent and repeated in nature." Nelson v. Commissioner of Correction, 390 Mass. 379, 388 n.12 (1983). This mechanism has been utilized in previous challenges to the procedures by which the board exercises its discretion. See Quegan, 423 Mass. at 835; Blake v. Massachusetts Parole Bd., 369 Mass. 701, 702-703 (1976).

The court -- and Diatchenko and Roberio -- do not contend that the board has failed in this respect such that a request for declaratory relief is warranted at this time. Importantly, the review process for granting parole is currently based on comprehensive, individualized assessments. In determining whether a particular inmate is suitable for parole, the board is charged by statute with ascertaining the extent to which the inmate has been rehabilitated, and the extent to which, if released, he or she would pose a risk to the community.[7] See

---

[7] "Decisions of the Executive Branch, however serious their impact, do not automatically invoke due process protection; there simply is no constitutional guarantee that all executive decisionmaking must comply with standards that assure error-free determinations." Greenholtz v. Inmates of the Neb. Penal & Correctional Complex, 442 U.S. 1, 7 (1979). "[T]he state may be specific or general in defining the conditions for release and

G. L. c. 127, § 130.  The board performs a "risk and needs

assessment" as well.  Id.  In so doing, it has the authority to

review and evaluate an inmate's entire record.  See Greenman,

405 Mass. at 387.  As required by statute, the board must be

provided with the complete criminal record of the inmate as well

as reports on the inmate's social, physical, mental, and

psychiatric condition and history.  G. L. c. 127, § 135.

Moreover, in making its determination, the board "shall consider

whether, during the period of incarceration, the prisoner has

participated in available work opportunities and education or

treatment programs and demonstrated good behavior."  G. L.

c. 127, § 130.  Finally, the board "shall also consider whether

risk reduction programs, made available through collaboration

with criminal justice agencies would minimize the probability of

---

the factors that should be considered by the parole authority.
It is thus not surprising that there is no prescribed or defined
combination of facts which, if shown, would mandate release on
parole. . . .  In parole releases . . . few certainties exist.
In each case, the decision differs from the traditional mold of
judicial decision-making in that the choice involves a synthesis
of record facts and personal observation filtered through the
experience of the decision maker and leading to a predictive
judgment as to what is best both for the individual inmate and
for the community.  This latter conclusion requires the board to
assess whether, in light of the nature of the crime, the
inmate's release will minimize the gravity of the offense,
weaken the deterrent impact on others, and undermine respect for
the administration of justice.  The entire inquiry is, in a
sense, an 'equity' type judgment that cannot always be
articulated in traditional findings" (footnote omitted).  Id.
at 8.

the prisoner re-offending once released." Id. All inmates are provided subsequent parole hearings if parole is initially denied. 120 Code Mass. Regs. § 300.01 (1997). These hearings are open to the public and parole-eligible offenders serving life sentences are permitted representation by counsel. 120 Code Mass. Regs. §§ 300.02(2), 300.08 (1997). Eventually, the board's decision becomes a public record. G. L. c. 127, § 130.

Further, in January, 2014, in response to Miller, the Legislature passed "An Act relative to juvenile life sentences for first degree murder" (act). St. 2014, c. 189. The act imposed a series of statutory changes affecting juveniles convicted of murder in the first degree including new sentencing and parole eligibility standards; mandating that at least one member of the board have experience in forensic psychology; authorizing the department to provide treatment and programming for youthful offenders irrespective of their crimes or duration of incarceration; and allowing the placement of qualified youthful offenders in a minimum security correctional facility, irrespective of their life sentence. The act further established a commission to

> "study and determine the usefulness and practicality of creating a developmental evaluation process for all cases of first degree murder committed by a juvenile [between the ages of fourteen and eighteen]. The evaluation process shall determine the developmental progress and abilities of the juvenile offender at the time of sentencing and parole eligibility and the parole board shall utilize the

evaluation process for future parole decisions regarding the juvenile offender."

In addition, the board, on its own initiative, amended its "Guidelines for Life Sentence Decisions" (guidelines) in light of Diatchenko I, requiring consideration of age-related factors in all parole cases involving juveniles convicted of murder in the first degree and incorporating the specific factors that the concurring justices considered when evaluating parole suitability for such individuals.  See note 1, supra.  Accordingly, inmates like the defendant now must be "evaluated with recognition of the distinctive attributes of youth, including immaturity, impetuosity, and a failure to appreciate risks and consequences."  See Diatchenko I, 466 Mass. at 675 (Lenk, J., concurring).  The guidelines now provide that the board can and should consider, among other things, the specific facts of the crime and rehabilitation.  Finally, in determining whether the inmate has been rehabilitated, the guidelines provide that the board shall consider his or her conduct while incarcerated.

Had this court intended to directly oversee the board's consideration of parole, we would have specifically provided guidance concerning the proper balance of the necessary factors or when to find that parole is warranted.  Yet, we declined to do so, specifically holding that it was in the board's "purview"

to evaluate the unique circumstances and conditions of the defendant.  Diatchenko I, 466 Mass. at 674.  See Doe v. Massachusetts Parole Bd., 82 Mass. App. Ct. 851, 861 (2012). This the board has done by revising its guidelines. Accordingly, a complaint for declaratory relief remains the best manner to ensure the meaningfulness of parole hearings by allowing challenges to procedural elements of these hearings such as the guidelines.  See Nelson, 390 Mass. at 388 n.12. There has been no showing that declaratory relief would be appropriate at this time.

For the foregoing reasons, I respectfully dissent.

CORDY, J. (dissenting, with whom Spina, J., joins).  I join and agree completely with Justice Spina's dissent.  I write separately only to underscore my strongly held view that the judicial branch should not intrude on what is plainly an executive branch function in the absence of a showing that that branch has failed to fulfil its legal or constitutional obligations.  There is not a hint of such a showing in this case.  To the contrary, all indicators of executive branch intentions support the conclusion that "meaningful opportunit[ies] to obtain release" on parole have been and will continue to be provided to individuals serving life sentences for murders they committed when they were juveniles.  There is no demonstrated need for the court to construct and order funded a special parole and appellate process for such prisoners.[1]

While the directives in the court's ruling regarding counsel, appeals, and the funding of experts may seem relatively benign to some, in unnecessarily intruding on the functions of another branch the court steps over the line that separates the powers accorded to each in our constitutional structure -- a separation we have proudly proclaimed as a necessary element of a constitutional democracy that ensures our government shall be

---

[1] Indeed, as the court's opinion has noted, Gregory Diatchenko already has been granted parole.

one of laws and not of men.[2]  In doing so, the court also fails

to accord the other branches the respect necessary to the proper

functioning of a government where each has its own

constitutional responsibilities.  While the role of the

judiciary may often include being a check on the other branches

when they exceed or fail in the execution of those

responsibilities, it is distinctly not to exercise them.[3]

Although we occasionally declare that the Massachusetts

Declaration of Rights creates certain duties in other branches,

such as ensuring a meaningful opportunity for release on parole,

we leave it to those branches "to define the precise nature of

the task[s] which they face in fulfilling" those duties.

McDuffy v. Secretary of the Exec. Office of Educ., 415 Mass.

545, 620 (1993).  To hold that such a meaningful opportunity can

only occur in the context of a parole hearing with counsel

appointed, experts on retainer, and a special appellate process,

---

[2] See art. 29 of the Massachusetts Declaration of Rights.

[3] Last year, we were quick to declare that the community
parole supervision for life law (G. L. c. 127, § 133D [a]) was
an unconstitutional delegation of a quintessential judicial
function, sentencing, to the parole board, an executive branch
of government, in violation of the constitutional separation of
powers clause at issue here.  Commonwealth v. Cole, 468 Mass.
294, 302 (2014).  In so doing, we also underscored and confirmed
that the granting of parole is "a discretionary act" and a
"function of the executive branch of government with which, if
otherwise constitutionally exercised, the judiciary may not
interfere" (emphasis added).  Id.

is to declare that we know best how to perform the tasks constitutionally assigned to others, in the absence of any evidence of failure or excess.[4]  This substitution at this juncture of our judgment for that of the parole board as to the expertise and advocacy necessary for it to properly exercise its executive discretion is a slippery slope, and one down which we should not embark.

---

[4] There is no suggestion in the court's opinion that the standard for determining an individual's suitability for parole for persons convicted of murder when they were juveniles is any different from the standard of suitability that any other prisoner must satisfy in order to obtain release on parole, i.e., that there is a "reasonable probability that, if the prisoner is released with appropriate conditions and community supervision, the prisoner will live and remain at liberty without violating the law, and that release is not incompatible with the welfare of society."  G. L. c. 127, § 130.